## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 18 2016, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Derick W. Steele
Deputy Public Defender
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of V.F and S.F. (Minor Children)

and

S.C. (Mother) and J.F. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

April 18, 2016

Court of Appeals Case No. 34A05-1508-JT-1291

Appeal from the Howard Circuit Court

The Honorable Lynn Murray, Judge

Trial Court Cause Nos. 34C01-1502-JT-27, -28

**Crone, Judge.**

# Case Summary

S.C. ("Mother") and J.F. ("Father") (collectively "Parents") appeal the trial court's order involuntarily terminating their parental relationship with their minor children V.F. and S.F. (collectively "the children"). The sole issue raised for our review is whether the trial court clearly erred in terminating the parent-child relationship. Finding no clear error, we affirm.

# Facts and Procedural History

The Howard County Division of Child Services ("DCS") originally became involved with this family in 2012 when the children were adjudicated children in need of services ("CHINS") after Father was arrested, Mother was struggling with substance abuse, and Parents lacked stable housing. The children were returned to Parents' care for three months in 2014 because Parents had met the objectives of the dispositional decree. However, a mere five days after the prior DCS wardship was terminated, DCS again became involved when the children, then ages four and three, were found outside their home with no supervision. Specifically,

> On March 2, 201[4], the Kokomo Police Department ("KPD")
> located the Parents passed out inside the home and they had to
> be forcefully awakened. KPD also found drug syringes and

needles in the Parent[s'] bedroom. Father admitted to using heroin and stated that Mother was using methamphetamine and oxycontin. The home was observed to have approximately six (6) syringes, two (2) of which were filled with a clear substance, and a spoon with a clear substance on it. A Crown Royal Whiskey bag containing several vials containing rock like substances of different colors and a pill crusher with white powdery residue and several razor blades, commonly used to crush pills for injection. Mother admitted that the liquid substance in the spoon and syringes were oxycodone. The house was cluttered throughout with clothes, trash and dirty dishes. Both Parents were arrested on charges of Possession of a Controlled Substance, a Class D Felony; Unlawful Possession of a Syringe, a Class D Felony; and Neglect of a Dependent, a Class D Felony.

Appellants' App. at 134.

[3] The children were removed from Parents' care and placed in foster care. DCS filed CHINS petitions and, following a factfinding hearing during which Parents stipulated to the allegations in the petitions, the children were adjudicated CHINS and placed with their paternal aunt. Following a dispositional hearing, Parents were ordered to participate in a multitude of services including: attend and participate in the visitation plan subject to providing DCS with negative drug screens; complete a parenting program; obtain and maintain gainful employment; obtain clean, suitable, and stable housing and allow DCS access to the home; refrain from illegal activity; not use any drugs or alcohol; successfully complete an intensive outpatient program; submit to random drug screens; attend and participate in individual therapy;

and complete parenting assessments and complete all recommendations developed as a result of the assessment. *Id*. at 136.

[4]     During a six-month review hearing on August 11, 2014, the trial court found that DCS had made reasonable efforts to provide services and reunify the family. Although Mother had initially shown motivation to participate in services, she had recently shown disinterest. Mother also had periods of infrequent visitation with the children due to positive drug screens for oxycodone. Father participated in several services and showed great interest in cooperating with DCS. However, Father's visitation with the children was suspended due to positive drug screens for oxycodone and hydrocodone.

[5]     During a three-month review hearing in November 2014, the trial court found that Mother was inconsistent in attending visitation and that visitation was eventually suspended after she tested positive for oxycodone and buprenorphine. The court found that although Father was cooperative at the beginning of August 2014, he became noncompliant by the end of that month. Father was incarcerated during September 2014 and was released in October 2014. After his release, Father's visitation was suspended when he tested positive for alcohol, oxycodone, and hydrocodone on several drug screens. DCS stated its intent to pursue termination of parental rights if progress toward reunification was not made.

[6]     On February 2, 2015, DCS filed an emergency motion for change of placement because the children's paternal aunt was moving to Alabama. The trial court

granted the motion and the children were placed in foster care. DCS filed petitions for the involuntary termination of parental rights on February 3, 2015. The trial court conducted a permanency hearing on February 9, 2015. Neither Mother nor Father appeared at the hearing, but counsel for each parent appeared. The court concluded that the children should remain out of the Parents' home. The court found that neither parent was in compliance with the case plan and that neither parent had consistently attended visitation or participated in services. Although Parents had obtained employment, both quit after only four days. In addition to extensive criminal histories, each parent also had pending criminal matters at the time of the permanency hearing.

[7] A termination factfinding hearing was held on June 22, 2015. Mother failed to appear and Father appeared in the custody of the Howard County Sheriff. Following the hearing, the trial court made sixty-two detailed findings of fact and conclusions thereon, some of which state in relevant part:

> 31. …. At the time of the termination hearing, [V.F.] was five (5) years of age and [S.F.] was four (4) years of age. Of the past thirty-five (35) months, the children have been removed from the care and custody of their parents for total of thirty-two (32) months.

> 32. Since the children's removal, the Parents have made minimal progress towards their ability to provide for the children. The Parents have largely failed to participate with DCS and service providers and have failed to show an ability to remain clean and sober due to their refusals to submit to random drug screens when requested or submitting positive screens. The Parents['] visitation has been extremely inconsistent with the children due

to the numerous times their visitation has been suspended. Both parents have continued to show ambivalence towards reunification with the children and have shown no initiative to be a custodial parent to the children. This is the second time the children have been removed from the Parents and the children deserve to have a safe, stable, permanent home. The Parents have been provided extensive services towards reunification through the two (2) CHINS cases, and have been unable to remain drug free and provide a safe, stable, home for the children.

....

44. The children require the security of safe, nurturing environment and routine providing them with stability. Most importantly, the children need and require permanency in their lives.

45. The Court finds that DCS made reasonable efforts to reunify the children with [Parents].

46. In the judgment of the Court, the Parents are likely to never adequately care and provide for the children as custodial parents.

....

57. The Court further finds by clear and convincing evidence that the continuation of the parent-child relationship between the children and their parents poses a threat to the well[-]being of the children. A termination of the parent-child relationship is in the best interest of the children because the children need permanency with caregivers who can provide them with a nurturing environment that is secure and free of abuse and neglect and meets the children's needs until the children reach the age of majority.

....

61. The Court further finds by clear and convincing evidence that termination of the parent-child relationships of the [P]arents to the children is in the best interests of the children in that further efforts to reunite the parents and children are unlikely to succeed. The failure to terminate the relationship will deny the children the stability and permanency to which they are entitled, and have too long been denied. It is in the children's best interests to have permanency, not perpetual foster care and uncertainty in their lives.

62. The Court further finds by clear and convincing evidence that the DCS has a satisfactory plan for the care and treatment for the children, which plan is to place them for adoption.

*Id*. at 140-49. This appeal ensued.

## Discussion and Decision

[8] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.,* 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

…

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[9] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Section 1 – The trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being is not clearly erroneous. [1]

[10]    While their argument is somewhat unclear, Parents appear to challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being. Our supreme court recently explained that a trial court "need not wait until a child is irreversibly influenced by a deficient lifestyle such that [his or] her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 649 (Ind. 2015) (citation omitted). "In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct to determine whether there is a

---

[1] We note that Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive and DCS was required to establish only one of the three requirements of subparagraph (B). While our review of the record reveals clear and convincing evidence supporting the trial court's conclusion pursuant to subsection (B)(i) that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied, we rely on much of the same evidence to address only whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being. Ind. Code § 31-35-2-4(b)(2)(B)(ii); *see In re A.K.*, 924 N.E.2d 212, 221 (Ind. Ct. App. 2010) (explaining that evidence demonstrating that parent posed a threat to child's well-being was also used to support conclusion that mother remained unable to adequately care for child as well as conclusion that termination was in child's best interests), *trans. dismissed.*

substantial probability of future neglect or deprivation." *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). "At the same time, however, a trial court should judge a parent's fitness to care for [his or her] child as of the time of the termination proceedings, taking into consideration evidence of changed conditions." *Id.*

[11] Here, the trial court found that a mere five days after a prior DCS wardship concerning these children concluded, DCS again became involved with this family after the children, then ages four and three, were found outside their home with no supervision. After authorities discovered a drug-filled home in squalid condition, the children were removed and placed in the care of their paternal aunt. Parents were ordered to complete a multitude of services, all with the goal of providing the children with a safe, stable, and drug-free environment. The record indicates that although Parents were each initially motivated to participate in the court-ordered services, each eventually became wholly noncompliant. Parents have each consistently tested positive for drugs and/or refused to submit to random drug screens, and each has failed to consistently attend visitation with the children and/or has had that visitation suspended.

[12] The record also indicates that both Parents have extensive criminal histories and continue to refuse to live-law abiding lives. At the time of the termination hearing, Mother had an active warrant for her arrest on a petition to revoke suspended sentence due to alleged probation violations, and Father was incarcerated on a pending petition to revoke suspended sentence. Mother failed

to even appear at the termination hearing while Father appeared in the custody of the Howard County Sheriff.

[13] Despite the ample evidence of their habitual pattern of conduct indicating a substantial probability of future neglect or deprivation, Parents compare their situation with *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). In *Bester,* our supreme court reversed a trial court's order terminating a father's parental rights because there was not clear and convincing evidence to support the trial court's conclusion that the father posed a threat to the child's well-being. *Id.* at 153. The *Bester* court considered a variety of factors that indicated that the father did *not* pose a threat to the child, which included: (1) the father's full compliance with the reunification plan, such as attending therapy, parenting classes, and drug testing; (2) the loving, caring, and happy interactions between the father and the child during visitations; (3) that there was "no causal connection between [the] [f]ather's living arrangements and any adverse impact those arrangements may have on the [c]hild," or that the homes of the father's relatives were unsuitable; and (4) the father's current improvements demonstrated a desire to provide a healthy and drug-free environment, and a past criminal history was not enough to demonstrate that the father was a threat to the child. *Id.* at 149-53; *K.E.*, 39 N.E.3d at 650-51.

[14] Parents' situation here is nothing like *Bester*. Unlike the father in *Bester*, Parents have failed to consistently participate in services and each continues to show total ambivalence toward reunification. Significantly, Parents have made no

improvements that demonstrate a desire to provide a healthy and drug-free environment for their children. Indeed, Parents' drug abuse and criminal behavior are not simply things of the past, but remain current threats to the stability and well-being of these children.

[15] Based upon the clear and convincing evidence presented, we defer to the trial court's determination that Parents' habitual patterns of conduct support a conclusion that there is a substantial probability of future neglect. The children were removed from an unstable, unsafe, and drug-filled environment, and Parents have done virtually nothing to remedy any of those conditions.[2] The trial court did not clearly err in concluding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children.

## Section 2 – The trial court's conclusion that termination of the parent-child relationship is in the children's best interests is not clearly erroneous.

[16] In the last sentence of their brief, Parents mention for the first time that termination of their parental rights was not in the children's best interests. Because they offer no real argument, Parents have waived our review of this issue. *See A.D.S. v. Ind. Dep't of Child Servs.,* 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013) (failure to support arguments with cogent reasoning results in

---

[2] We note that the trial court found that prior to the births of V.F. and S.F., Mother had been provided extensive services during CHINS cases involving her three older children. Mother's parental rights were also terminated as to those children because she failed to take the necessary steps required for reunification.

waiver on appeal), *trans. denied*; *see also* Ind. Appellate Rule 46(A)(8)(a) (requiring that each contention be supported by cogent reasoning and citations).

[17] Waiver notwithstanding, in determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.,* 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* Children have a paramount need for permanency, which our supreme court has deemed a central consideration in determining a child's best interests. *In re E.M.,* 4 N.E.3d 636, 647-48 (Ind. 2014). As noted earlier, courts need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* The testimony of service providers may support a finding that termination is in the child's best interests. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[18] Here, both the family case manager ("FCM") and the court-appointed special advocate ("CASA") recommended termination of Parents' parental rights. FCM Khristen Scircle emphasized that the children need consistency and safety and a "permanent home to grow up in[,]" but Parents had done nothing to show that they "are willing to [provide] that at this time." Tr. at 57. Similarly, CASA Dominique Hayes testified that the children had essentially been removed from Parents' home for almost three full years and have had to be moved between two different foster/relative-care homes. She opined that the children had "already suffered" enough, and they now need consistency. *Id*. at

66. Indeed, the record indicates that the children are thriving and have made great progress since their removal from Parents' care.[3]

[19] The evidence presented clearly and convincingly shows that Parents are unwilling and/or unable to alter their irresponsible and criminal behavior for the good of the children. This is hardly a case where it arguably could be said that the termination of parental rights was based solely on the grounds that the children need permanency. *See In re V.A.*, No. 02S04-1602-JT-93, 2016 WL 661748 at *9 (Ind. Feb. 18, 2016) (explaining that a child's need for immediate permanency is not reason enough to terminate parental rights where the parent has an established relationship with his/her child and has taken positive steps toward reunification). It is well settled that a parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the child's best interests. *A.P.,* 981 N.E.2d at 82. Based upon the record before us, the trial court's conclusion that termination of parental rights is in the children's best interests is not clearly erroneous.

---

[3] The record indicates that S.F. has been diagnosed with reactive attachment disorder and post-traumatic stress disorder and, when she was first removed from the home, she was nonverbal and would crouch near the door during therapy sessions. S.F. has made exceptional progress since removal and is now more verbal and social. V.F. has also been diagnosed with post-traumatic stress disorder and he shows some signs of reactive attachment disorder. He has described to his therapist in detail the traumatic events that occurred in Parents' home. He has also made substantial progress since removal.

Affirmed.

Riley, J., and Pyle, J., concur.